# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Hood Packaging Corporation,<br><br>                    Plaintiff,<br><br>vs.<br><br>Brian Steinwagner, Morris Converting, LLC, and Morris Packaging, L.L.C.,<br><br>                    Defendants. | Case No.:  14-cv-02979-MJD-FLN<br><br>**MORRIS CONVERTING, LLC AND MORRIS PACKAGING, LLC'S JOINT (i) ANSWER TO AMENDED COMPLAINT AND (ii) FIRST AMENDED COUNTERCLAIMS** |

Defendants Morris Packaging, LLC and Morris Converting, LLC, for their Answer, Separate Defenses, and First Amended Counterclaims to Plaintiff's Amended Complaint, state and allege as follows:

For this pleading's purposes, "Steinwagner" means Defendant Brian Steinwagner; "Hood" means Plaintiff Hood Packaging Corporation; "Morris Converting" means Defendant Morris Converting, LLC; and "Morris Packaging" means Defendant Morris Packaging, L.L.C.  The two Morris LLCs will sometimes be referred to herein as the "Morris Entities."

## FIRST DEFENSE

### ANSWERS TO SPECIFIC ALLEGATIONS AND GENERAL DEFENSE

### PARTIES

1-2.    Plaintiff Hood Packaging Corporation ("Hood Packaging") is a corporation organized under the laws of the State of Mississippi, with its principal place of business at 25 Woodgreen Place, Madison, MS 39110. Hood Packaging is a citizen of Mississippi

as that term is used in Title 28, United States Code section 1332.

     2.     Defendant Brian Steinwagner ("Steinwagner") is an individual who is a resident of and domiciled in Wisconsin, residing at 738 Regal Ridge Circle, Hudson, WI 54016. Upon information and belief, Steinwagner is a citizen of Wisconsin as that term is used in Title 28, United States Code section 1332.

**ANSWER:**   The Morris Entities admit paragraphs 1-2 of the Amended Complaint.

     3.     Defendant Morris Packaging, L.L.C. ("Morris Packaging") is a limited liability corporation organized under the laws of the State of Illinois, with its principal place of business at 211 North Williamsburg Drive, Bloomington, IL 61704. Morris Packaging is a citizen of Illinois as that term is used in Title 28, United States Code section 1332.

**ANSWER:**   The Morris Entities admit paragraph 3 of the Amended Complaint.

     4.     Defendant Morris Converting, LLC ("Morris Converting") is a limited liability corporation organized under the laws of the State of Missouri, with its principal place of business at 607 Missouri Boulevard Court, Jefferson City, MO 65109-1769. Morris Converting is a citizen of Missouri as that term is used in Title 28, United States Code section 1332.

**ANSWER:**   The Morris Entities admit paragraph 4 of the Amended Complaint.

### JURISDICTION AND VENUE

     5.     Subject matter jurisdiction is proper pursuant to Title 28, United States Code section 1332, because this is a civil action where the matter in controversy exceeds

2

the sum of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs, between citizens of different states. Plaintiff Hood Packaging is a citizen of Mississippi. Defendant Steinwagner is a citizen of Wisconsin. Defendant Morris Packaging is a citizen of Illinois. Defendant Morris Converting is a citizen of Missouri. No members of Morris Packaging or Morris Converting are citizens of Mississippi. More than $75,000 is at issue in this action.

**ANSWER:**    The Morris Entities deny diversity jurisdiction is present but admit the pleaded citizenship of the parties in paragraph 6 of the Amended Complaint.

6.    Venue is appropriate in this Court pursuant to Title 28, United States Code section 1391(a), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

**ANSWER:**    The Morris Entities deny paragraph 6 of the Amended Complaint.

## FACTUAL BACKGROUND

**A.    Hood Packaging is a key player in the packaging industry and formerly employed Steinwagner**

7.    Hood Packaging is a leader in the design and manufacture of a wide range of packaging materials.

**ANSWER:**    The Morris Entities deny paragraph 7 of the Amended Complaint but admit that Hood manufacturers and sells flexible packaging products and does boast from time to time that it is an industry leader.

8.    Steinwagner was employed by Hood Packaging for approximately eleven

3

years. Most recently, he was the General Manager of Hood Packaging's North Region, responsible for sales in excess of $65 million per year. He worked out of Hood Packaging's Arden Hills, Minnesota facility.

**ANSWER:** The Morris Entities do not have sufficient facts to respond to paragraph 8 of the Amended Complaint, except that Steinwagner was General Manger of Hood's North Region U.S. Consumer Group of the Hood Plastics Division for a time and was located in Arden Hills, Minnesota, and therefore deny same.

9. Steinwagner resigned from Hood Packaging on June 5, 2014, stating that, "As of today 6-5-14 I would like to resign as General Manager of the Northern Region Hood Packaging." He offered to stay at Hood Packaging for two weeks after he resigned. Hood Packaging declined Steinwagner's offer and treated the resignation as effective June 5, 2014.

**ANSWER:** The Morris Entities do not have sufficient facts to respond to paragraph 9 of the Amended Complaint and therefore deny same.

10. Upon information and belief, Steinwagner started working as an employee at Morris Packaging on June 9, 2014.

**ANSWER:** The Morris Entities deny the allegations in paragraph 10 of the Amended Complaint. Steinwagner joined Morris Packaging on June 29, 2014.

**B.** **Steinwagner was subject to a non-compete agreement with Hood Packaging and had access to the company's trade-secret information**

11-27.

4

**ANSWER:** The allegations in paragraphs 11-27 of the Amended Complaint are directed to Steinwagner and not to the Morris Entities. No responses are called for by the Morris Entities to paragraphs 11-27.

### C.     Hood Packaging entered into a Sales Agent Agreement with Morris Packaging

28.    Hood Packaging and Morris Packaging entered into a Sales Agent Agreement ("Agency Agreement") effective December 9, 2004. A copy of the Agency Agreement is attached as Exhibit B and adopted by reference pursuant to Federal Rule of Civil Procedure 10(c).

**ANSWER:**    Morris Packaging admits that Hood and Morris Packaging entered into the Agency Agreement effective December 9, 2004, and that a copy of that agreement (in part) is attached as Exhibit B to the Amended Complaint. The allegations in paragraphs 28-35 of the Amended Complaint are not asserted against Morris Converting and so no response by Morris Converting is required.

29.    Pursuant to the Agency Agreement, Morris Packaging agreed to use its best efforts to pursue business and orders for the sale of Hood Packaging's products and to present the interests of Hood Packaging:

> [Hood Packaging] hereby appoints Morris Packaging its Sales Agent to pursue orders for the sale of [Hood Packaging]'s Products…. [Morris Packaging] hereby accepts such appointments and agrees to use its best efforts to pursue business and orders from customers in the assigned Territory and to otherwise represent the interest of [Hood Packaging] in the Territory in accordance with the terms and provisions of this Agreement.

(Ex. B at ¶ 1.)

**ANSWER:**  Morris Packaging states that the "Agency Agreement" referred to in this paragraph 29 is a writing that speaks for itself.

30.     Further, pursuant to the Agency Agreement, Morris Packaging agreed not to pursue orders for products that are competitive to the products offered by Hood Packaging without prior written consent or maintain an ownership interest in a competing company:

> During the term hereof, [Morris Packaging] shall not, without prior written consent from [Hood Packaging], pursue orders for products which are competitive to the products offered by [Hood Packaging], and shall not maintain an ownership interest, either directly or indirectly, in any enterprise which manufactures or markets products which are competitive to the products offered by [Hood Packaging].

(Ex. B at ¶ 12.)

**ANSWER:**    Morris Packaging states that the "Agency Agreement" referred to in paragraph 30 is a writing that speaks for itself.

31.     Morris Packaging also agreed not to divulge any of Hood Packaging's confidential information or to make use of such information in a competitive enterprise during or after the term of the Agency Agreement:

> Both during and after the term hereof, [Morris Packaging] shall not divulge to any third party, or make use of in a competitive enterprise, any information confidential to [Hood Packaging], including, but not limited to, product information, pricing, technology and specifications.

(Ex. B at ¶ 12.)

6

**ANSWER:**   Morris Packaging states that the "Agency Agreement" referred to in this paragraph 31 is a writing that speaks for itself.

32.    The Agency Agreement also included an additional term granting Morris Packaging exclusive rights to sell Hood Packaging products to an attached list of accounts unless the accounts are active national accounts supplied currently by Hood Packaging or an account with a presence of Hood Packaging:

> Morris Packaging to have exclusive rights to all accounts listed as Exhibit "B" titled Morris Packaging, Pride Packaging and Roar Packaging unless such accounts are active national accounts supplied currently by Hood Packaging Corporation or any Accounts with a presence of Hood Packaging Corporation.

(Ex. B at p. 7.)

**ANSWER:**   Morris Packaging states that the "Agency Agreement" referred to in this paragraph is a writing that speaks for itself, except Morris Packaging admits that the Agency Agreement gave Morris Packaging exclusive rights to the accounts listed on Exhibit B, not just to sell Hood products but to sell any products.

33.    The Agency Agreement went into effect on December 9, 2004 and continued indefinitely, unless terminated by either party with ninety days written notice. (Ex. B at ¶¶ 2, 10.)

**ANSWER:**   Morris Packaging admits the Agency Agreement went into effect in December 2004 and continued with modifications agreed to by both parties until June 2014 when Hood purported to terminate the Agency Agreement. The effort by Hood, however, was a breach of Section 10 of the Agency Agreement.

MSP01\151073.1
IDUDKE - 111160\0001

34.    The Agency Agreement was signed by Jim Morris as President of Morris Packaging on December 19, 2004 and by Hood Packaging's Director of Sales and Marketing on December 28, 2004. (Ex. B at p. 5.)

**ANSWER:**    Morris Packaging admits that in December 2004 Jim Morris signed the Agency Agreement on its behalf and that Todd Kimbrell signed on behalf of Hood, and denies the remaining allegations in paragraph 34.

### D.    Morris Packaging starts a competing converting operation – Morris Converting – and plans to take Hood Packaging customers and personnel.

35.    Morris Packaging sells, among other things, flexible packaging materials. As far back as February 2013, Morris Packaging started developing a business plan for a converting operation to produce custom flexible packaging.

**ANSWER:**    Morris Packaging admits that Morris Packaging sells flexible packaging materials, including products which Hood does not sell, and that in 2013 Morris Packaging, or an affiliate, purchased two converting machines, with a view toward providing converting operations for Diamond Pet and other orders Morris Packaging procured, a fact well known to Hood senior management at the time and approved by them as mutually beneficial for the two companies, and done to reduce a backlog that had developed in Diamond Pet orders.

36.    At least one set of Morris Packaging presentation materials discussed the "Thievery of Personnel" from Hood Packaging. Morris Packaging's business plan included Brian Steinwagner as a potential owner of the new company.

**ANSWER:** Morris Packaging is without sufficient information to admit or deny the allegations set forth in paragraph 36 of the Amended Complaint and therefore denies the same.

37. The new company, Morris Converting, was incorporated in Missouri on July 12, 2013 and established operations in Jefferson City, Missouri. The operations of Morris Converting are in competition with Hood Packaging.

**ANSWER:** Morris Converting admits it filed limited liability company papers in Missouri on July 12, 2013 and states that Hood senior management knew of and approved Morris Converting entering into the business of manufacturing bags, and deny the remaining allegations in paragraph 37 of the Amended Complaint.

38. On information and belief, the converting machines were online and Morris Converting was ready to start training employees by January 2014.

**ANSWER:** Morris Converting admits that in early 2014 it began manufacturing bags using the converting machines. These facts also were known to Hood senior management, and welcomed as a partial solution to a bottleneck which had arisen at Hood that prevented Hood from timely delivering bags to Diamond Pet and others.

**E.  Steinwagner sends highly confidential customer and prospect information to Morris Packaging and starts competing with Hood Packaging during his employment. He continues to violate his non-compete restrictions after his employment ends**

39. Steinwagner began actively looking for employment outside of Hood Packaging as early as March 2014.

9

**ANSWER:** The Morris Entities do not have sufficient facts to respond to this allegation and therefore deny paragraph 39 of the Amended Complaint.

40.   By May 13, 2014, Steinwagner and Jim Morris (President of Morris Packaging) were in detailed discussions about the employment package for Steinwagner to work for Morris Packaging, including the structure of his commissions, a two-year commitment on his base salary, a guaranteed college scholarship for Steinwagner's son, and a new vehicle. These discussions were outlined in a May 13, 2014 email from Jim Morris to Steinwagner.

**ANSWER:**    Morris Packaging states that the email referred to in this paragraph is a writing that speaks for itself.  In May 2014 Jim Morris and Steinwagner discussed terms of employment if Steinwagner joined Morris Packaging.  The Morris Entities deny the remainder of paragraph 40 of the Amended Complaint.

41.    In the same May 13, 2014 email, Jim Morris asked Steinwagner to "[g]et the targets outlined on the QT if you can.... I would like us to outline a pretty extensive list of targets and do a dossier on what you/we can." Morris then discussed the products to pitch to targets "i.e. Quad bag, bottom seal, Roll Stock, WPP, Paper Bags, Bulk Bags, etc." On information and belief, many of those products are planned to be or are actively produced by Morris Converting or an affiliated company.

**ANSWER:** Morris Packaging states that the email referred to in this paragraph 41 is a writing that speaks for itself and admits that certain of the bags identified in paragraph 41 of the Amended Complaint are manufactured by Morris Converting.

10

42.     In the May 13, 2014 email, Jim Morris also mentioned discussing with an attorney "options for hiring [Steinwagner] under one of the other companies, in order to create a little distraction to [Hood Packaging]." Jim Morris then discussed a plan to fly Steinwagner down to Jefferson City on May 22, 2014.

**ANSWER:** Morris Packaging states that the email referred to in this paragraph 42 is a writing that speaks for itself.

43.     On May 19, 2014, Steinwagner emailed Jim Morris to discuss the timing of his resignation from Hood Packaging. Steinwagner noted his contacts with current Hood Packaging customers the following next week, and an upcoming trips for Hood Packaging to two potential customers on June 2 and 3, 2014. Steinwagner also planned to stop by a current Hood Packaging customer on June 4, 2014 to notify them of his intentions and then to resign from Hood Packaging on June 6, 2014.

**ANSWER:**     Morris Packaging states that the email referred to in this paragraph 43 is a writing that speaks for itself.

44.     After telling Morris of his plan to resign on Friday, June 6, Steinwagner stated, "We need to discuss what to expect. I would guess I will be asked to leave the building on Friday."

**ANSWER:**     Morris Packaging states that the email referred to in this paragraph 44 is a writing that speaks for itself.

45.     At around the same time, Hood Packaging was working on a proposal to update the Agency Agreement with Morris Packaging. Steinwagner was part of preparing

11

that proposal for Morris Packaging.

**ANSWER:** Morris Packaging admits that it had negotiated with Steinwagner to amend the Hood relationship, and had received proposals from Hood through Steinwagner and is without sufficient information to admit or deny the remaining allegations in paragraph 45 of the Amended Complaint.

46.   On May 21, 2014, Steinwagner emailed a proposed agreement from Hood Packaging to Jim Morris.

**ANSWER:** Morris Packaging admits that on May 21, 2014 Morris Packaging received a written proposal for an amended relationship between Hood and Morris Packaging based on the fact that Morris Packaging now had its own converting capacity, among other things, and denies the remaining allegations in paragraph 46.

47.   On May 27, 2014, Steinwagner used a non-Hood Packaging email account to transmit to Jim Morris of Morris Packaging a plan to obtain various business from Hood Packaging and to compete against Hood Packaging. Steinwagner sent Morris a detailed list of Hood customers and prospects, including proprietary information regarding production and contract information. Steinwagner tried to hide his wrongful and illegal conduct by using the email account "psteinwagner@hotmail.com" that lists "Penny Steinwagner" in the "From" field for emails sent from that account. Upon information and belief, Steinwagner's wife's name is Penny. The email sign off was from "Brian." This plan was in competition with Hood Packaging and relied upon and disclosed Hood's confidential, proprietary, and trade-secret information.

12

**ANSWER:**  Morris Packaging admits that on May 27, 2014,  Morris Packaging received an email from Steinwagner; denies that the content of the email relies upon or contains "confidential, proprietary, and trade-secret information" of Hood, and denies that the email describes or furthered a plan by Morris Packaging to breach any duty owed to Hood, and states the email speaks for itself.

48.    On May 30, 2014, Jim Morris forwarded the May 27 email to Steinwagner's Hood Packaging email account, stating that he could not open the attached document. Later that night, Steinwagner replied to Jim Morris from the psteinwagner@hotmail.com email account: "Try this one. Don't send to work E-Mail like you just did."

**ANSWER:**  Morris Packaging admits the first sentence of paragraph 48 of the Amended Complaint, admits the receipt thereafter of an email from Steinwagner that contains the quoted language, states that the email is a writing that speaks for itself, and admits that on May 30, 2014 Morris returned Steinwagner's May 27, 2014 email to Steinwagner at his Hood email account.

49.    On June 1, 2014, Jim Morris flew to Wisconsin and met with Steinwagner.

**ANSWER:**  Morris Packaging admits paragraph 49 of the Amended Complaint.

50.    On June 2, 2014, Steinwagner emailed a Hood Packaging executive that, "I have been unable to get a response from Jim [Morris] on the agreement that you had me send over. Maybe it is time for you to call him." The email did not mention the in-person meeting Steinwagner had with Jim Morris the day before.

13

**ANSWER:**    Morris Packaging states the quoted email speaks for itself, and Morris Packaging does not have sufficient facts and therefore denies the remaining allegations in paragraph 50 of the Amended Complaint.

51.    Steinwagner's employment with Hood Packaging ended effective June 5, 2014 when he resigned from the company.

**ANSWER:**  Morris Packaging does not have sufficient facts to respond and therefore denies the allegation in paragraph 51 of the Amended Complaint except states that it understands Steinwagner was terminated by Hood on June 5, 2014.

52.    Just prior to resigning from Hood Packaging, Steinwagner met with one or more Hood Packaging customers and, upon information and belief, did so with the purpose of obtaining information to provide to Morris Packaging and/or Morris Converting and to compete against Hood Packaging.

**ANSWER:**  Morris Packaging does not have sufficient facts and therefore denies paragraph 52 of the Amended Complaint.

53.    Steinwagner's, Morris Packaging's, and Morris Converting's conduct was and is in furtherance of a scheme to obtain and convert to their use and gain Hood Packaging's records, trade secrets, confidential information, and manufacturing information and techniques and the goodwill generated, directly and indirectly, by Steinwagner's association with Hood Packaging.

**ANSWER:**    The Morris Entities deny paragraph 53 of the Amended Complaint.

14

54.   Steinwagner disclosed and provided Hood Packaging's confidential, proprietary, and trade-secret information to Morris Packaging and, on information and belief, to Morris Converting for purposes of competing against Hood while he was still employed with Hood Packaging, in direct violation of his fiduciary and loyalty obligations to Hood Packaging and the terms of his Non-Compete Agreement.

**ANSWER:**   The Morris Entities deny paragraph 54 of the Amended Complaint.

55.   Hood Packaging terminated the Agency Agreement on June 24, 2014.

**ANSWER:**   Morris Packaging admits that Hood purported to terminate the Agency Agreement on June 24, 2014 but denies that Hood had a right to do so or followed the proper procedure.

56.   On information and belief, Steinwagner has competed against Hood Packaging in violation of his Non-Compete Agreement by visiting at least three Hood Packaging customers for purposes of competing against Hood Packaging and bringing that business to Morris Packaging and/or Morris Converting. This competition has caused or will cause irreparable damage to Hood Packaging's reputation and good will, as well as monetary damages.

**ANSWER**:   The Morris Entities deny the allegations set forth in paragraph 56 of the Amended Complaint.

57.   On information and belief, Morris Packaging has competed against Hood Packaging in violation of its Agency Agreement by diverting business from Hood Packaging to competing companies, including but not limited to Morris Converting prior

15

to the June 24, 2014 termination of the Agency Agreement.

**ANSWER:**  The Morris Entities deny the allegations set forth in paragraph 57 of the Amended Complaint.

58.    Hood Packaging has been damaged by Steinwagner's, Morris Packaging's, and Morris Converting's wrongful actions in an amount in excess of $75,000.

**ANSWER:**  The Morris Entities deny the allegations set forth in paragraph 58 of the Amended Complaint.

59.    The value of the trade secrets misappropriated by Steinwagner, Morris Packaging, and Morris Converting is in excess of $75,000.

**ANSWER:**  The Morris Entities deny the allegations set forth in paragraph 59 of the Amended Complaint and state that Hood has no expert or factual evidence to support this allegation, which is a transparent effort to manufacture diversity jurisdiction based on the alleged value of trade secrets when Hood has repeatedly admitted that it has suffered no damages in terms of lost sales.

### FIRST CAUSE OF ACTION

### (Breach of Contract against Steinwagner)

58-68.   The allegations in this cause of action and these paragraphs are not against the Morris Entities and they are not required to make any response to them.

### SECOND CAUSE OF ACTION

### (Misappropriation of Trade Secrets against Steinwagner)

69-79.   The allegations in this cause of action and these paragraphs are not against

16

the Morris Entities and they are not required to make any response to them.

### THIRD CAUSE OF ACTION

#### (Breach Of Fiduciary Duty against Steinwagner)

80-91.  The allegations in this cause of action and these paragraphs are not against the Morris Entities and they are not required to make any response to them.

### FOURTH CAUSE OF ACTION

#### (Breach Of Duty Of Loyalty against Steinwagner)

92-95.  The allegations in this cause of action and these paragraphs are not against the Morris Entities and they are not required to make any response to them.

### FIFTH CAUSE OF ACTION

#### (Tortious Interference with Business Expectancy against Steinwagner)

96-102.  The allegations in this cause of action and these paragraphs are not against the Morris Entities and they are not required to make any response to them.

### SIXTH CAUSE OF ACTION

#### (Conversion against Steinwagner)

103-107.    The allegations in this cause of action and these paragraphs are not against the Morris Entities and they are not required to make any response to them.

### SEVENTH CAUSE OF ACTION

#### (Uniform Deceptive Trade Practices Act against Steinwagner)

108-111.    The allegations in this cause of action and these paragraphs are not against the Morris Entities and they are not required to make any response to them.

17

## EIGHTH CAUSE OF ACTION

### (Unjust Enrichment against All Defendants)

112.    Hood Packaging re-states and re-alleges the foregoing paragraphs as though fully set forth herein.

**ANSWER:**  Morris Packaging restates its response to paragraphs 1-111 of the Amended Complaint as set forth here.

113.    Steinwagner solicited Hood Packaging's customers and prospective customers for Morris Packaging and Morris Converting during his employment with Hood Packaging and, after his resignation, using Hood Packaging's confidential, proprietary, and trade secret information.

**ANSWER:** The Morris Entities deny the allegations set forth in paragraph 113 of the Amended Complaint.

114.    Steinwagner, Morris Packaging, and Morris Converting have received a benefit from Hood Packaging based on his conduct and under circumstances that make it inequitable for him to retain the benefit without paying for it.

**ANSWER:** The Morris Entities deny the allegations set forth in paragraph 114 of the Amended Complaint.

115.    Steinwagner's, Morris Packaging's, and Morris Converting's retention of the benefit without paying for it constitutes unjust enrichment.

**ANSWER:** The Morris Entities deny the allegations set forth in paragraph 115 of the Amended Complaint.

18

## NINTH CAUSE OF ACTION

### (Permanent Injunction against Steinwagner)

116-119.     The allegations in this cause of action and these paragraphs are not against the Morris Entities and they are not required to make any response to them.

## TENTH CAUSE OF ACTION

### (Breach of Contract against Morris Packaging)

120.     Hood Packaging re-states and re-alleges the foregoing paragraphs as though fully set forth herein.

**ANSWER:** Morris Packaging restates its responses to paragraphs 1-119 of the Amended Complaint as set forth here.

121.     Morris Packaging entered into a valid and enforceable contract (the Agency Agreement) with Hood Packaging effective December 9, 2004.

**ANSWER:** The Agency Agreement is a legally binding contract between Hood and Morris Packaging.  In addition to serving as agent or broker for Hood Morris Packaging also placed orders with Hood to its own account with a view toward resale of the products to Morris Packaging customers.

122.     Hood Packaging performed all conditions precedent.

**ANSWER:** Morris Packaging denies paragraph 122 of the Amended Complaint and states Hood breached several conditions precedent to its action including but not limited to the 90 day notice provision of Section 10 of the Agency Agreement.

123.  Pursuant to the Agency Agreement, Morris Packaging had an obligation to use its best efforts to pursue business and orders from customers for Hood Packaging and to not pursue orders for products that are competitive to the products offered by Hood Packaging.

**ANSWER:**  Morris Packaging states the Agency Agreement speaks for itself as to the obligations of both the parties and denies the remaining allegations in paragraph 123 of the Amended Complaint.

124.  Pursuant to the Agency Agreement, Morris Packaging also agreed not to divulge any of Hood Packaging's confidential information or to make use of such information in a competing enterprise during or after the term of the Agency Agreement.

**ANSWER:**  Morris Packaging states the Agency Agreement speaks for itself as to the obligations of both the parties and denies the remaining allegations in paragraph 124 of the Amended Complaint.

125.  Morris Packaging breached its contractual obligations by diverting business from Hood Packaging.

**ANSWER:**  Morris Packaging denies the allegations in paragraph 125 of the Amended Complaint.

126.  Morris Packaging breached its contractual obligations by using Hood Packaging's trade secrets, confidential information, and other proprietary data in a competing enterprise.

MSP01\151073.1
ID\JDKE - 111160\0001

**ANSWER:** Morris Packaging denies the allegations in paragraph 126 of the Amended Complaint.

127. Hood Packaging has suffered damages as a direct result of Morris Packaging's breach of its contractual obligations.

**ANSWER:** Morris Packaging denies the allegations in paragraph 127 of the Amended Complaint.

128. In addition, as a consequence of the foregoing, Hood Packaging will continue to suffer substantial damages and financial loss including but not limited to the loss of customers and customer good will as a result of Morris packaging' s breaches.

**ANSWER:** Morris Packaging denies the allegations in paragraph 128 of the Amended Complaint.

## ELEVENTH CAUSE OF ACTION

### (Breach of the Duty of Good Faith and Fair Dealings [sic] against Morris Packaging)

129. Hood Packaging re-states and re-alleges the foregoing paragraphs as though fully set forth herein.

**ANSWER:** Morris Packaging restates is responses to paragraphs 1-128 of the Amended Complaint as set forth here.

130. Hood Packaging and Morris Packaging were parties to the Agency Agreement.

**ANSWER:** Morris Packaging admits paragraph 130 of the Amended Complaint.

21

MSP01\151073.1
ID\JDKE - 111160\0001

131.    Hood Packaging performed the conditions precedent and other obligations as required under the Agency Agreement.

**ANSWER:**  Morris Packaging denies paragraph 131 of the Amended Complaint and incorporates its response to paragraph 122.

132.    The duty of good faith and fair dealings [sic] is inferred into contracts in Minnesota.

**ANSWER:**  Paragraph 132 of the Amended Complaint is a statement of law to which no response is required.

133.    Morris Packaging breached the duty of good faith and fair dealing in several ways, including but not limited to conspiring with Steinwagner during his employment at Hood Packaging to compete with Hood Packaging and take business from Hood Packaging, and using Hood Packaging's confidential, proprietary, and trade secret information to set up a competing company.

**ANSWER:**  Morris Packaging denies paragraph 133 of the Amended Complaint.

134.    Morris Packaging's breach of the duty of good faith and fair dealing under the Agency Agreement has damaged Hood Packaging.

**ANSWER:**  Morris Packaging denies paragraph 134 of the Amended Complaint.

135.    Hood Packaging is entitled to recover its damages for the breach of the duty of good faith and fair dealings by Morris Packaging.

**ANSWER:**  Morris Packaging denies paragraph 135 of the Amended Complaint.

MSP01\151073.1
ID\JDKE - 111160\0001

## TWELFTH CAUSE OF ACTION

### (Misappropriation of Trade Secrets against Morris Packaging and Morris Converting)

136.    Hood Packaging re-states and re-alleges the foregoing paragraphs as though fully set forth herein.

**ANSWER:**  The Morris Entities incorporate their responses to paragraphs 1-135 of the Amended Complaint as if set forth here.

137.    The confidential information of Hood Packaging that Morris Packaging and Morris Converting gained access, as described above, constituted trade secrets within the meaning of the Minnesota Uniform Trade Secrets Act, Minn. Stat. § 325.C.01-08.

**ANSWER:**  The Morris Entities deny the allegations in paragraph 137 of the Amended Complaint.

138.    Hood Packaging's confidential customer and internal operational information derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

**ANSWER:**  The Morris Entities deny the allegations in paragraph 138 of the Amended Complaint.

139.    Hood Packaging has made reasonable efforts to maintain the secrecy of such confidential customer and internal operational information.

MSP01\151073.1
ID\JDKE - 111160\0001

**ANSWER:** The Morris Entities deny the allegations in paragraph 139 of the Amended Complaint.

140. Morris Packaging and Morris Converting knew, or had reason to know, that they acquired Hood Packaging's trade secrets under circumstances giving rise to a duty for it to maintain the secrecy and limit the use of those trade secrets.

**ANSWER:** The Morris Entities deny the allegations in paragraph 140 of the Amended Complaint.

141. Morris Packaging and Morris Converting did not have Hood Packaging's express or implied consent to disclose or use Hood Packaging's trade secrets.

**ANSWER:** The Morris Entities deny the allegations in paragraph 141 of the Amended Complaint.

142. On information and belief, Morris Packaging and Morris Converting disclosed and used, and is continuing to disclose and use, Hood Packaging's trade secrets to sell to or solicit customers and prospect customers of Hood Packaging.

**ANSWER:** The Morris Entities deny the allegations in paragraph 142 of the Amended Complaint.

143. Morris Packaging and Morris Converting's actions constitute misappropriation of Hood Packaging's trade secrets.

**ANSWER:** The Morris Entities deny the allegations in paragraph 143 of the Amended Complaint.

24

144.    Morris Packaging and Morris Converting's conduct in misappropriating Hood Packaging's trade secrets by improperly acquiring, using, and disclosing such trade secrets in breach of a duty to maintain the secrecy of such trade secrets was willful and malicious.

**ANSWER:**    The Morris Entities deny the allegations in paragraph 144 of the Amended Complaint.

145.    As a result of Morris Packaging and Morris Converting's misappropriation of Hood Packaging's trade secrets, Hood Packaging has suffered damages.

**ANSWER:**    The Morris Entities deny the allegations in paragraph 145 of the Amended Complaint.

146.    Morris Packaging and Morris Converting's misappropriation of Hood Packaging's trade secrets also entitles Hood Packaging to injunctive relief as provided by Minn. Stat. § 325C.02, to exemplary damages pursuant to Minn. Stat. § 325C.03, and to attorney fees pursuant to Minn. Stat. § 325C.04.

**ANSWER:**    The Morris Entities deny the allegations in paragraph 146 of the Amended Complaint.

## THIRTEENTH CAUSE OF ACTION

### (Tortious Interference with Business expectancy against Morris Packaging and Morris Converting)

147.    Hood Packaging re-states and re-alleges the foregoing paragraphs as though fully set forth herein.

**ANSWER:** The Morris Entities restate their responses to paragraphs 1-147 of the Amended Complaint as if set forth here.

148. Hood Packaging has business expectancies with its customers and prospective customers in the areas where it is actively conducting business.

**ANSWER:** The Morris Entities deny the allegations in paragraph 148 of the Amended Complaint.

149. Hood Packaging profits from these business expectancies by selling packaging and other services to thee companies.

**ANSWER:** The Morris Entities deny the allegations in paragraph 149 of the Amended Complaint.

150. Morris Packaging and Morris Converting knew of the business expectancies between Hood Packaging and its customers and prospective customers.

**ANSWER:** The Morris Entities deny the allegations in paragraph 150 of the Amended Complaint.

151. Morris Packaging and Morris Converting intentionally interfered with these business expectancies by soliciting and causing a breach or termination of the business expectancies from Hood Packaging's customers and prospective customers.

**ANSWER:** The Morris Entities deny the allegations in paragraph 151 of the Amended Complaint.

MSP01\151073.1
ID\JDKE - 111160\0001

152.    Morris Packaging and Morris Converting were not justified or privileged in interfering with the business expectancies between Hood Packaging and its customers and prospective customers.

**ANSWER:**   The Morris Entities deny the allegations in paragraph 152 of the Amended Complaint.  The Morris Entities are protected by both conditional and absolute privileges as to their conduct in regard to Hood.

153.    Morris Packaging's and Morris Converting's intentional interference with the business expectancies between Hood Packaging's customers and prospective customers caused damage to Hood Packaging.

**ANSWER:**   The Morris Entities deny the allegations in paragraph 153 of the Amended Complaint.

## FOURTEENTH CAUSE OF ACTION

### (Tortious Interference with Contract against Morris Packaging)

154.    Hood Packaging re-states and re-alleges the foregoing paragraphs as though fully set forth herein.

**ANSWER:**   Morris Packaging restates its responses to paragraphs 1-153 of the Amended Complaint as if set forth here.

155.    Morris Packaging knew of the Non-Compete Agreement between Steinwagner and Hood Packaging, and further knew the specific terms of that contract, including those terms setting forth the confidentiality agreement and non-compete agreement.

27

**ANSWER:**  Morris Packaging denies the allegations of paragraph 155 of the Amended Complaint, and states that at the time Steinwagner was hired Morris Packaging had seen the 2009 Non-Compete Agreement and had received an explanation from Steinwagner as to how paragraph 6(a) came to be crossed out, and had seen a June 5, 2014 letter to Steinwagner from Hood's Erica Haley stating that Steinwagner had been terminated, and had received Steinwagner's description of the events of June 5, 2014.

156.    Morris Packaging intentionally interfered with the contractual relationship between Steinwagner and Hood Packaging and further intentionally caused Steinwagner to breach his contract with Hood Packaging by having Steinwagner assemble a list of target customers to compete with Hood Packaging while Steinwagner was still employed at Hood Packaging and by having Steinwagner solicit Hood Packaging customers within one year of his resignation in violation of Steinwagner's non-compete provision.

**ANSWER:**  Morris Packaging denies the allegations of paragraph 156 of the Amended Complaint.

157.    Morris Packaging was not justified in interfering with the contractual relationship between Hood Packaging and Steinwagner caused damage to Hood Packaging.

**ANSWER:**  Morris Packaging denies the allegations of paragraph 157 of the Amended Complaint.

MSP01\151073.1
IDUDKE - 111160\0001

158.   Morris Packaging's intentional interference with the contractual relationship between Hood Packaging and Steinwagner caused damage to Hood Packaging.

**ANSWER:**   Morris Packaging denies the allegations of paragraph 158 of the Amended Complaint.

## FIFTEENTH CAUSE OF ACTION

### (Unfair Competition against All Defendants)

159.    Hood Packaging re-states and re-alleges the foregoing paragraphs as though fully set forth herein.

**ANSWER:**   The Morris Entities restate their responses to paragraphs 1-158 of the Amended Complaint as if set forth here.

160.   The acts and conduct of Defendants as alleged in this Amended Complaint constitute unfair competition pursuant to the common law of the State of Minnesota.

**ANSWER:** The Morris Entities deny the allegations set forth in paragraph 160 of the Amended Complaint.

161.   Defendants' acts and conduct as alleged above have damaged and will continue to damage Hood Packaging and have resulted in an illicit gain of profit to Defendants in an amount that is unknown at the present time.

**ANSWER:**   The Morris Entities deny the allegations set forth in paragraph 161 of the Amended Complaint.

MSP01\151073.1
IDUDKE - 111160\0001

## SIXTEENTH CAUSE OF ACTION

### (Civil Conspiracy – All Defendants)

162.    Hood Packaging re-states and re-alleges the foregoing paragraphs as though fully set forth herein.

**ANSWER:**    The Morris Entities restate their responses to paragraphs 1-161 as if set froth here.

163.    Defendants were engaged in a civil conspiracy to accomplish some concerted actions that injured Hood Packaging.

**ANSWER:**    The Morris Entities deny the allegations set forth in paragraph 163 of the Amended Complaint.

164.    Defendants committed and executed certain acts in pursuance of certain torts as alleged in this Amended Complaint.

**ANSWER:**    The Morris Entities deny the allegations set forth in paragraph 164 of the Amended Complaint.

165.    That as a result of Defendants misappropriation of trade secrets, tortious interference with business expectancy, tortious interference with contract, unjust enrichment, and other torts alleged in this Amended Compliant, Defendants conspired and agreed to commit such acts.

**ANSWER:**    The Morris Entities deny the allegations set forth in paragraph 165 of the Amended Complaint.

MSP01\151073.1
ID\JDKE - 111160\0001

166.    Defendants' conspiracy caused damage to Hood Packaging.

**ANSWER:** The Morris Entities deny the allegations set forth in paragraph 166 of the Amended Complaint.

## SEVENTEENTH CAUSE OF ACTION

### (Permanent Injunction against Morris Packaging and Morris Converting)

167.    Hood Packaging re-states and re-alleges the foregoing paragraphs as though fully set forth herein.

**ANSWER:**    The Morris Entities restate their responses to paragraphs 1-66 of the Amended Complaint as if set forth here.

168.    Hood Packaging will be irreparably harmed should Morris Packaging continue to breach the confidentiality provision of the Agency Agreement.    Hood Packaging will be further irreparably harmed should Morris Packaging and Morris Converting continue to misappropriate Hood Packaging's trade secrets.

**ANSWER:**    The Morris Entities deny paragraph 168 of the Amended Complaint.

169.    The remedy of damages is not fully adequate in this action.

**ANSWER:**    The Morris Entities deny paragraph 169 of the Amended Complaint.

170.    Morris Packaging should be permanently enjoined from breaching the Agency Agreement, misappropriating Hood Packaging's trade secrets, and otherwise violating the terms of the Agency Agreement.

**ANSWER:**    The Morris Entities deny paragraph 170 of the Amended Complaint.

31

171.    Morris Converting should be permanently enjoined from misappropriating Hood Packaging's trade secrets.

**ANSWER:**    The Morris Entities deny paragraph 171 of the Amended Complaint.

## SEPARATE DEFENSES

### SECOND DEFENSE

172.    Except to the extent specifically admitted herein each allegation and characterization of the Amended Complaint is hereby denied.

### THIRD DEFENSE

173.    Plaintiff's claims are barred by the doctrines of unclean hands, waiver, and equitable estoppel.

### FOURTH DEFENSE

174.    All or some of Plaintiff's claims are preempted by the Minnesota Uniform Trade Secrets Act.

### FIFTH DEFENSE

175.    To the extent Hood asserts claims that constitute intentional torts the claims are time barred either by the applicable statute of limitations or by laches.

### SIXTH DEFENSE

176.    Hood breached the Agency Agreement in 2009 and thereafter in various ways and the breaches by Hood justified any non-performance by Morris Packaging.

MSP01\151073.1
ID\JDKE - 111160\0001

## SEVENTH DEFENSE

177.    Any conduct by the Morris Entities in regard to Hood was both absolutely and conditionally privileged.

## EIGHTH DEFENSE

178.    Hood has failed to mitigate its alleged damages.

## NINTH DEFENSE

179.    The effort by Hood to obtain trade secret relief including the claim of misappropriation against the Morris Entities was made in bad faith and the Morris Entities have a right under Minn. Stat. § 325C.04 to their reasonable attorney's fees and costs for having to defend the claims.

## TENTH DEFENSE

180.    To the extent that the May 27, 2014 email disclosed information to Morris Packaging that Hood now contends was a trade secret Steinwagner had the express or implied consent of Hood to make that disclosure under Minn. Stat. § 325C.01, subd. 3 (ii).

## ELEVENTH DEFENSE

181.    The Agency Agreement is a sales representative agreement as that term is defined in Section 325E.37, Subd. (1)(e) ("Sales Agent Act"). The Sales Agent Act applies to any such agreement where the sales agent's territory included, in whole or part, Minnesota. The territory of Morris Packaging under the Agency Agreement included the entire United States.

MSP01\151073.1
ID\JDKE - 111160\0001

182.    Hood breached the Sales Agent Act:

(a) by failing to provide Morris with 90 days written notice of termination of the Agency Agreement setting forth the good cause reasons for the termination and failing to give Morris 60 days to cure the alleged good cause, and

(b) by not having good cause to terminate the Agency Agreement, and

(c) by asserting a claim for breach of the Agency Agreement in this Court despite the mandatory arbitration requirement of Subdivision 5(a) of the Sales Agent Act.

183.    Each of the above breaches requires the Court to dismiss all the counts asserted against Morris Packaging in the Amended Complaint.

## FIRST AMENDED COUNTERCLAIMS

Morris Packaging and Morris Converting assert the following First Amended Counterclaims against Hood:

## FACTUAL BACKGROUND

1.      On December 9, 2004 Hood and Morris Packaging entered into the Sales Agent agreement ("Agency Agreement") under which Morris agreed to use its best efforts to "secur[e] orders for [Hood] Products," in return for an 8.5% commission. The "Products" were multiwall shipping sacks, poly flexible packaging, essentially plastic bags for consumer goods like potato chips, or pet food bags, along with graphics and small paper bags. The Agency Agreement did not compel Hood to accept any order procured by Morris Packaging. Hood and Morris Packaging specifically agreed in the Agency Agreement that Morris would have "exclusive rights to all accounts" listed on an

34

exhibit to that agreement – over 100 accounts that Morris was bringing to Hood (Morris Packaging continued to bring new accounts to Hood after 2004.). Morris was also attractive to Hood because Morris is an accredited "minority business enterprise" ("MBE") and thus gave Hood access to a sales channel for which Hood was not qualified.

2.     The principal duty of Hood under the Agency Agreement was to determine whether accounts Morris brought to Hood would become "accepted accounts" and then, as to orders Morris Packaging procured from such accounts, to manufacture good quality products per Morris Packaging design specifications and deliver the products in a timely fashion to the customers. Morris Packaging developed each packaging specification for the Morris Packaging account; Hood followed specific instructions from Morris Packaging in manufacturing multiwall sacks, and poly flexible packaging for its customers.

3.     The manufacture of plastic bags under the Agency Agreement essentially consisted of three steps:

(1)     manufacture a 6.7 mil sealant film, as prescribed by Morris Packaging for each order;

(2)     print the customer's artwork on a 48 gauge polyester film, and laminate the film with the 6.7 mil sealant film ("printed roll stock"), as per instructions from Morris Packaging customer service representatives; and

(3)     cut the film and form and seal the bag ("converting").

MSP01\151073.1
ID\JDKE - 111160\0001

Hood touted to Morris Packaging Hood's size and purported ability to service large, high-volume customers and Morris targeted such customers under the Agency Agreement.

4.      Hood was a much larger enterprise than Morris Packaging with many other sales facilities, including in-house salespeople.  Almost immediately after the Agency Agreement went into operation Hood began to overreach and take advantage of Morris:

a.)      Many accounts on Exhibit B to the Agency Agreement were located in Wisconsin but Hood notified Morris Packaging that Hood had agreed not to compete with Dairyland Packaging, a competitor of Hood, and that all sales of Hood products in Wisconsin would be made through Dairyland and so Morris Packaging could no longer sell to those customers unless Morris Packaging accepted prices set by Dairyland Packaging that did not include a commission for Morris Packaging;

b.)      One of the accounts Morris Packaging brought to Hood was Newlywed Foods, which sold spice blends and batter throughout the country.  After that account began to generate millions of dollars of revenues each year Hood breached the Agency Agreement and began soliciting Newlywed Foods directly.  Hood was successful in removing Morris Packaging as the broker and procuring agent for the account, and has cost Morris commissions on millions of dollars in sales to Newlywed Foods.

5.      From 2004 to 2011 the Morris relationship was highly profitable for Hood. Another large volume key account that Morris Packaging brought to Hood was Diamond Pet, (listed on Exhibit B as Customer Number 35), a company that used plastic bags for the pet food products it made and sold.  Diamond Pet was growing and quickly became

36

one of the top accounts at Hood. Diamond Pet's orders were filled by the northern region of its U.S. consumer group of Hood's Plastics Packaging Division.

6.    In 2011 Diamond Pet notified Morris Packaging that it was building another manufacturing facility in California and that Diamond Pet expected to increase its orders to Morris Packaging once that facility came on line in late 2012. Morris Packaging relayed this information to Hood and asked the Arden Hills plant to obtain additional equipment to satisfy the expected new orders from Diamond Pet, but Hood management declined to make the necessary investment. Hood was skeptical that Morris really could deliver the large increase in Diamond Pet orders that Morris Packaging had predicted.

7.    Starting in 2011 (and continuing in 2012 and 2013) Hood concluded that it had an overconcentration problem with Diamond Pet – too much of its total sales to a single customer – and also decided not to allocate the necessary production capacity to keep up with the increasing Diamond Pet demand – but Hood did not disclose these facts to Morris and instead kept accepting orders from Morris Packaging for the Diamond Pet business and promising timely delivery. Hood had 17 manufacturing plants (at the time the northern region had four plants but Hood soon closed one of them) but Hood refused to allocate production from plants outside the northern region to Diamond Pet orders. Hood devoted that capacity to service accounts where it did not have to pay commissions, in order to increase Hood profits. The effect of these decisions was to reduce output for Morris Packaging and it's customer(s) and to create late deliveries for Diamond Pet.

37

Indeed, in 2011 Hood had purchased a converting machine which Morris requested be located at Grand Forks but Hood sent the machine to a Canadian plant.

8.    Deliveries to Diamond Pet became seriously backlogged in 2012 and the backlog continued into 2014.  Hood addressed the backlog by purchasing on the open market some of the components of its products, such as printing and lamination, but obtaining components this way was expensive and Hood found the expense of delivering bags to Diamond Pet was increasing due to what it called an "Outsourcing Premium".

9.    After 2011 the Hood northern region manufacturing facilities had insufficient capacity for Diamond Pet's needs in all three aspects of the work – Hood could no longer manufacture enough sealant film, nor could Hood print or laminate the film, and could not convert it into bags timely for Morris and Diamond Pet.  The Outsourcing Premium reduced profit margins so Hood found itself in the position of making less money per sale as Morris Packaging brought in more  and more Diamond Pet orders, a situation Hood's President Robert Morris found unacceptable.

10.    By 2013 the backlog had grown to 8 million bags and both Morris Packaging and Diamond Pet saw that Hood had no plan to accommodate Diamond Pet's growth.  Diamond Pet concluded Hood was not committed to supporting Diamond Pet and expressed dissatisfaction to Morris Packaging and to Hood with Hood's failure to deliver bags when promised, and with the repeated excuses from Hood as to its failures.  Diamond Pet also complained of quality problems.  In July 2013 Hood President Robert

Morris wrote Morris's Jim Morris (no relation) stating: "I apologize on behalf of Hood that we are not meeting the expectations set."

11.    At this point Diamond Pet was purchasing all its flexible packaging requirements from Morris Packaging and Morris was delivering all those orders to Hood. But by mid-2013 Morris Packaging recognized that the backlog had become such a serious breach of Morris Packaging's and Hood's duties to Diamond Pet that Morris Packaging was in jeopardy of losing the Diamond Pet account.

    a.)    In July 2013 Hood's Robert Morris and Morris's Jim Morris talked and Robert said Hood had neither the capacity nor willingness to support Diamond Pet's future growth.  Robert explained that Hood was achieving in excess of 30% returns on investment in its corrugated business, but the flexible packaging that Diamond Pet was buying generated only about 17% return on investment so it was unwise for Hood to add capacity for so little profit;

    b.)    Robert told Jim either to get Diamond Pet to pay 10% more for the bags it was buying (which Jim said was foolish under the circumstances) or, failing that, Morris should divert – purge - up to 50% of the Diamond Pet business to another bag manufacturer;

    c.)    Jim told Robert that Morris could purchase converting machines itself, locate them next to Diamond Pet's plant and hold the Diamond Pet business Hood no longer wanted.  Robert endorsed this plan (although it is unclear whether he told

Hood's ownership at the time that his solution to the Diamond Pet problems was to put Morris Packaging in the converting business).

d.)    This arrangement could resolve the bottleneck problem and prevent Morris Packaging (and Hood indirectly) from losing the Diamond Pet account.  The arrangement could also solve Hood's profitability concerns as set forth below.  And Hood would still profit on the "purged" Diamond Pet business if it sold printed rollstock for Diamond Pet to Morris Converting.

e.)    Following this conversation Jim Morris reluctantly  sought a 10% price increase from Diamond Pet, which was promptly rejected, as he expected Diamond Pet said that Hood should be able to manufacture product more efficiently as its orders increased and should not be seeking a price increase when its deliveries were long overdue and the product had quality problems.

12.    But when it came time for Hood to quote rollstock prices to Morris in early 2014 Hood set unreasonable terms in an effort to squeeze Morris on work to be done on the new Morris Converting machines.  Since Hood controlled the price at which Morris sold to Diamond Pet (per the Agency Agreement) and thought it controlled the price at which Morris Converting would purchase printed rollstock Hood believed it could shift costs to Morris Converting on the bag sales to Diamond Pet that Hood itself did not fulfill.  But Jim was aware that Hood had purchased printed rollstock from a Minnesota based manufacturer for Diamond Pet and he was able to obtain printed rollstock from that

supplier (and others) at prices far less than Hood's. Morris Converting tried to get Hood to reduce its printed rollstock prices but Hood refused to do so.

13.    Hood had always been uncomfortable with the amount of Morris's commission. A senior Hood officer complained that it was too high and that Morris did not contribute enough to the flow of Diamond Pet business to justify the commission. (Both of these complaints were untrue.) But once Morris had purchased converting machines Hood saw a way to reduce commissions: it would sell rollstock printed with Diamond Pet artwork to Morris Converting (which would finish the bags) and Hood would not pay a commission on these sales because they did not fall under the Agency Agreement. By the end of 2013 Hood had budgeted over $8 million of 2014 sales to go to Morris Converting. The remaining Diamond Pet orders would be filled by Hood as before but the per sale profitability would increase because Hood could do the work in-house and avoid the Outsource Premium.

14.    In early 2014, the Morris converting machines became operational.

15.    As the Morris Converting machines began fulfilling orders using rollstock from another supplier (and as Diamond Pet began purchasing bags from other manufacturers as set forth below) the orders from Morris to Hood for Diamond Pet work dropped. Hood suddenly did a turnabout and was not satisfied with this sharing of the account. By January or February 2014, Hood executives began discussing what they called the "Nuclear Option": terminate the Agency Agreement and sell direct to Diamond Pet despite having promised Morris that Morris had "exclusive rights" to the Diamond

41

Pet account (and the other Morris accounts listed on Exhibit B to the Agent Agreement and that Morris Packaging had brought to Hood). Hood knew that Morris "controlled Diamond Pet" and so Hood decided to take steps to destroy that vendor - customer relationship. Hood knew it would not satisfy all of Diamond Pet's needs but wanted to sell at least half of Diamond Pet's requirements in the future without the burden of the Morris Packaging commission. Hood hoped that Morris would fail as a converter and that Hood could then purchase the Morris converting machines located next to Diamond Pet and solidify a direct Hood-Diamond Pet relationship.

16.   In March 2014 Carrie Hood, a senior executive of Hood, attended a national sales meeting where she publicly told a group of people in the flexible packaging industry that Hood had to get rid of Jim Morris and Morris Packaging. Any person who heard this statement must have concluded that Morris Packaging had failed to perform its duties to Hood or had otherwise acted to justify an end to a relationship the industry knew was both successful and mutually profitable. At the same time that Carrie Hood was making these statements Robert Morris was telling Morris Packaging that Hood had acquired the paper unit of a major bag manufacturer so Hood "will have an even stronger position within the North American packaging market" and therefore Hood "want[s] to strengthen our ties with companies such as yours that are focused on profitable growth."

17.   Hood never did solve the manufacturing bottleneck, but Hood never rejected any Diamond Pet orders, it simply failed to deliver product in a timely fashion even in to 2014.

MSP01\151073.1
ID\JDKE - 111160\0001

18.    In 2013, despite the untimely deliveries, Morris had brought Hood over $22 million in orders from Diamond Pet, but by the end of 2013 Diamond Pet was weary of the excuses for Hood's failure to deliver and began to purchase a large amount of its flexible packaging needs from another manufacturer with whom Morris has no agency agreement.  As a result Morris now has lost a large part of the Diamond Pet business and has suffered millions of dollars of damages.  Had Hood either delivered products to Diamond Pet as promised, or rejected orders and allowed Morris to fill them elsewhere earlier than it did, Morris would have continued to earn commissions on the sales of substantially all of Diamond Pet flexible purchasing needs in 2014 and thereafter.

19.    In late June 2014, Hood terminated the Agency Agreement and immediately solicited sales directly from Diamond Pet.  At this point, despite the harm Hood's untimely deliveries had caused Morris Packaging's relationship with Diamond Pet, Morris Packaging was doing exactly what Robert Morris had instructed it to do and the termination was without cause.

20.    Senior Hood managers then sent salespeople to Diamond Pet who offered to sell the Hood products Diamond Pet had been purchasing from Morris Packaging for 22% less than before.  The Hood sales team also defamed Morris Packaging by telling Diamond Pet that the *sole reason* its pre-termination prices to Diamond Pet were so much higher than its new prices was because of commissions paid to Morris (hiding from Diamond Pet that Hood's own production costs had increased because Hood chose to outsource materials for Diamond Pet work.)  These false statements undermined Morris

43

with Diamond Pet because Morris had told Diamond Pet that his earlier effort to raise prices at Hood's request was due to Hood's own production costs.

21.     Hood was successful and has diverted Diamond Pet sales from Morris to Hood itself, although Morris Packaging continues to be a major supplier to Diamond Pet.

22.     The Agency Agreement provided for termination on 90 days written notice. Hood ignored the notice provision and notified Morris Packaging that Hood was terminating the agreement immediately because Morris Packaging had breached the agreement by purchasing the converting machines – which Hood had earlier approved. The allegation of breach by Morris Packaging was false and malicious and, on information and belief, Hood has told others in the flexible packaging industry that Morris Packaging was terminated for breach of the Agency Agreement.  By the time of the purported termination Hood had decided that Morris Packaging, with its new converting machines and access to printed rollback, would become Hood's largest competitor in the Northern Region.

23.     As noted earlier, a key aspect of Morris Packaging is that it is an MBE – minority business enterprise.  In June 2014 Hood made plans to compete with Morris Packaging by setting up its own MBE, even though MBE status is not available to major companies like Hood that are not majority owned by minorities. The goal was to provide Morris Packaging customers with the same benefit that Morris Packaging was providing them.

MSP01\151073.1
IDUDKE - 111160\0001

24.     Despite the fact that Hood had repeatedly breached the Agency Agreement and had ignored the proper termination protocol, Jim Morris contacted Hood senior managers in June 2014, after the purported termination, and tried to work out an amended relationship based on the current circumstances.  His efforts were rebuffed and instead Hood filed this lawsuit.  When Morris Packaging submitted orders to Hood after June 24, 2014 Robert Morris directed that any such orders should not be fulfilled.  But for the termination of the Agency Agreement Hood would be receiving today about half of the Diamond Pet orders that Morris Packaging receives from Diamond Pet.

## CAUSES OF ACTION

## COUNT ONE

### (Breach of Agency Agreement – Wrongful Termination)

25.     Morris Packaging restates the allegations in paragraphs 1 – 24 here as if set forth here.

26.     The Agency Agreement is in the nature of a long-term executory contract where Morris Packaging as agent brings customers and orders to Hood as manufacturer and the two parties mutually benefit from the sales that arise from the relationship. Minnesota law imputes to such contracts a duty of good faith and fair dealing.  The Agency Agreement allows each side to terminate the Agreement but requires the parties to follow a procedure set forth therein.  To the extent that a party sets forth a reason for termination that reason must be well grounded in fact and truthful.

27.    Hood breached the Agency Agreement by failing to follow the proper termination process set forth in the contract.

28.    Hood breached the Agency Agreement by purporting to justify the termination by alleging that Morris Packaging had improperly competed with Hood by purchasing the converting machines and putting them in competition with Hood when that is exactly what Robert Morris had requested Morris Packaging do.

29.    Hood breached the Agency Agreement by refusing to accept orders from Morris Packaging after August 2014.

30.    As a direct result of Hood's breaches of the Agency Agreement Morris Packaging has been harmed and has a right to damages in amounts to be proved at trial.

## COUNT TWO

**(Breach of Agency Agreement – Conversion of Newlywed Foods Account)**

31.    Morris Packaging restates the allegations in paragraphs 1 – 30 of the Counterclaims as if set forth here.

32.    The Agency Agreement is a contract between Hood and Morris Packaging. Under the Agency Agreement Morris Packaging brought Newlywed Foods to Hood as a customer and Hood designated Newlywed Foods as an "accepted account" belonging " exclusively" to Morris Packaging.    From 2005 to 2009 Hood manufactured flexible packaging in response to orders from Morris for delivery to Newlywed Foods, and Hood paid commissions to Morris Packaging on the sales it had procured.

46

33.    In 2009 Hood went to Newlywed Foods to sell directly and cut out Morris Packaging. Hood's conduct violated the Agency Agreement but the terms Hood offered were so attractive that Newlywed Foods accepted and ceased sending orders to Morris Packaging.

34.    As a direct result of the foregoing breach of the Agency Agreement Morris Packaging has lost commissions on approximately $72 million of sales to Newlywed Foods.

## COUNT THREE

**(Breach of Agency Agreement – Failure to Deliver Product to Diamond Pet)**

35.    Morris Packaging restates paragraphs 1 – 34 herein as if fully set forth here.

36.    Hood had a duty under the Agency Agreement to deliver quality goods as specified by Morris Packaging in a timely fashion to Diamond Pet. In 2012 – 2014 Hood repeatedly breached this duty by delivering product as much as eight weeks late.

37.    As a direct result of Hood's breach of this Agency Agreement in late 2013 Diamond Pet ceased buying 100% of its packaging needs from Morris Packaging and began purchasing a large portion of its needs from another manufacturer. Morris Packaging no longer supplies all the bags Diamond Pet requires.

38.    Morris Packaging has been damaged, in amounts to be proved at trial, by the loss of Diamond Pet business in the amount of the commission money Morris Packaging would have received in 2014 and for the reasonable future had Hood not breached its duties under the Agency Agreement as set forth here.

47

## COUNT FOUR

### (Violation of Minnesota Sales Agent Act)

39.     Morris Packaging restates paragraphs 1 – 38 herein as if set forth here.

40.     The Minnesota Sales Agent Act, Minn. Stat. § 325E.37 regulates sales agency contracts where the agent's territory includes Minnesota, in whole or in part.  The Agency Agreement is a sales agent contract regulated by the Sales Agent Act:

41.     Hood breached the Sales Agent Act:

    (a)     by failing to provide Morris Packaging with 90 days written notice of termination of the Agency Agreement setting forth good cause reasons for the termination and providing Morris Packaging 60 days to the alleged good cause; and

    (b)     by not having good cause to terminate the Agency Agreement and falsely asserting Morris Packaging had set up a converting operation in violation of the Agency Agreement when Hood had expressly authorized Morris Packaging to do; and

    (c)     by asserting a claim for violation of the Agency Agreement in this action despite the mandatory contribution requirement of Subdivision 5(a) of the Sales Agency Act.

42.     As a direct result of Hood's breach of the Sales Agent Act Morris Packaging has been harmed and has a right to damages in amounts to be proved at trial.

MSP01\151073.1
ID\JDKE - 111160\0001

## COUNT FIVE

### (Violation of the Minnesota Deceptive Trade Practices Act)

43.     Morris Packaging restates the allegations of paragraphs 1 – 42 herein as if set forth here.

44.     The Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D, (the "DTPA") bars specific trade practices as unfair and fraudulent competition and unsound and uneconomic methods of distribution.    Among the prohibited conduct is disparagement of the goods, services of a seller by false or misleading representations of fact, Minn. Stat. § 325D.44, Subd. 1(8) *and* making false or misleading statements of fact concerning the reasons for price reductions, Minn. Stat. § 325D.44 Subd. 1 (11).

45.     Hood breached Subd. 1 (8) by falsely representing to customers and packaging industry individuals that Morris Packaging had breached its duties to Hood and that Hood was forced to terminate the agency relationship between Hood and Morris Packaging.

46.     Hood breached Subd. 1 (11) by falsely stating to Diamond Pet that the sole reason Hood was able to reduce the price of bags to Diamond Pet by 22% was that Hood had terminated Morris Packaging and no longer had to pay a commission on Diamond Pet sales.

47.     As a direct result of the foregoing breaches of the DTPA Morris Packaging has been harmed and has a right to injunctive relief to prevent Hood from engaging in the

MSP01\151073.1
ID\JDKE - 111160\0001

aforementioned prohibited conduct, along with its reasonable attorney's fees and expenses of proving this claim under Section 325D.45(2).

## COUNT SIX

### (Attorneys' Fees Pursuant to Minn. Stat. § 325C.04)

48.    The Morris Entities incorporate the preceding paragraphs by reference as if fully set forth herein.

49.    The Uniform Trade Secret Act imposes a duty on a party to prove all elements necessary to support a trade secret claim that party has brought. A party who asserts a trade secret claim in bad faith because the party knows it cannot prove all the elements of the claim is responsible for compensating the party against whom the claim was made for that party's reasonable attorneys' fees, costs, and disbursements.

50.    Hood has asserted its trade secret claim in bad faith because it has failed to identify any information beyond ordinary confidential business information that rises to the level of a trade secret to support its claims. Hood cannot have a trade secret claim without a trade secret. Nor has Hood demonstrated evidence to support the other elements of its trade secret claim.

51.    The Morris Entities have been damaged in an amount equal to the attorneys' fees and litigation expenses they have incurred in defending against Hood's meritless trade secret claims.

52.    The Morris Entities are entitled to recover from Hood his attorneys' fees and other litigation expenses pursuant to Minn. Stat. § 325C.04.

MSP01\151073.1
IDUDKE - 111160\0001

## COUNT SEVEN

### (Defamation)

53.    Morris Packaging restates the allegations in paragraphs 1 – 52 as if set forth herein.

54.    Morris Packaging has established a reputation as a reliable supplier of quality flexible packaging goods to a broad range of customers throughout the country. Morris Packaging is known as a minority business enterprise that can and does provide the same level of service to customers as much larger suppliers and customers and others in the flexible packaging industry know that if they deal with Morris Packaging they will not receive second tier treatment.

55.    Hood made statements to third parties that were false and defamatory regarding Morris Packaging including:

(a)    Carrie Hood told a group of flexible packaging industry people in March 2014 that Hood would have to get rid of Morris Packaging or its sales agent or broker;

(b)    Hood personnel told customers and others in June 2014 and thereafter that Morris Packaging had breached the Agency Agreement and that Hood was justified in terminating that Agreement;

(c)    Hood personnel, as directed by Hood senior management, told Diamond Pet in June 2014 that the sole reason Hood had charged

51

Diamond Pet 22% more than Hood then offered to Diamond Pet was

commissions paid to Morris Packaging (which Hood had then

terminated), and that Morris Packaging kept prices to Diamond

Pet "artificially high."

56.    As a direct result of the foregoing defamation Morris Packaging has been

harmed and has suffered damages in an amount to be proved at trial.

## COUNT EIGHT

### (Tortious Interference with Business Relationships and Prospective Economic Advantage)

57.    Morris Packaging restates the allegations in paragraphs 1 – 56 herein as set

forth here.

58.    Morris Packaging developed business relationships with Diamond Pet,

Newlywed Foods, and other customers whose orders Morris Packaging filled either by

selling products to those customers for commission under the Agency Agreement, or by

purchasing their needs from Hood and reselling to them.

59.    Hood intentionally and without justification interfered with Morris

Packaging's relationships with Diamond Pet, Newlywed Foods and other customers and

that interference caused Morris Packaging  to lose the relationships or to suffer reduced

business from the customers.

60.     Morris Packaging has been damaged by the tortious interference by Hood with Morris Packaging's customer relationships and prospective economic advantage and has suffered damages in amounts to be proved at trial.

## COUNT NINE

### (Unfair Competition)

61.     Morris Packaging restates the allegations set forth in paragraphs 1 – 60 herein as if fully set forth here.

62.     Morris Packaging delivered to Hood from 2004-2014 the designs and specifications of the products it sold to its customers, along with detailed information about those customer's particular needs, locations and buying patterns. Morris Packaging disclosed that information to Hood in return for Hood's promise that Morris Packaging could have "exclusivity" as to such customers.

63.     Hood first induced Morris Packaging to set up its own converting operation and then, when Morris Packaging had done so, Hood changed position and decided that Morris Converting likely would become the largest competitor of Hood's Northern Region of its U.S. consumer plastics unit so Hood began a course of conduct improperly to prevent that from happening.

64.     Hood took steps unfairly to hinder Morris Packaging's efforts to manufacture plastic bags:

MSP01\151073.1
ID\JDKE - 111160\0001

(a)    Hood excluded Morris Packaging from its Wisconsin customers (and from sales opportunities in Wisconsin) by virtue of an Anticompetitive Agreement Hood had made with Dairyland Packaging.

(b)    Hood offered Diamond Pet a 22% price cut and falsely told Diamond Pet that the sole reason Hood could offer the discounts was that it no longer had to pay a commission to Morris Packaging;

(c)    Hood falsely represented to Diamond Pet that the bottleneck was due to the fact that Morris Packaging's commission had to be paid, and concealed from Diamond Pet that Hood suffered from increased costs due to outsourcing of components of the Diamond Pet work;

(d)    Hood used the inside information Morris Packaging had supplied to Hood in regard to Morris Packaging customers to solicit those customers directly and compete with Morris Packaging; and

(e)    Hood falsely told customers that Hood had terminated the Agency relationship with Morris Packaging because Morris Packaging had breached its duties to Hood under that relationship.

(f)    Hood began to develop its own MBE so it could take Morris Packaging customers for whom MBE states was important even though Hood is owned by non-minorities and is not qualified for MBE status.

65.    As a direct result of Hood's unfair competition Morris Packaging has been harmed and has suffered damages in an amount to be proved at trial.

54

## DEMAND FOR JURY TRIAL

The Morris Entities demand a jury trial on all the issues so triable.

WHEREFORE, the Morris Entities demand that this Court enter judgment in their favor and against Hood as follows:

1.      Dismiss Hood's claims with prejudice and on the merits;

2.      Award injunctive relief to enjoin Hood from engaging in the following deceptive trade practices prohibited by Minn. Stat. § 325D.44: (i) representing to customers and packaging industry individuals that Morris Packaging had breached its duties to Hood and (ii)  making false or misleading statements of fact concerning the reasons for price reductions to Diamond Pet or other customers.

3.      Award reasonable compensatory and  consequential damages in their favor and against Hood on their counterclaims;

4.      Award them costs and attorneys' fees against Hood as damages and/or as allowed by law.

5.      Award them such other just and equitable relief as appropriate.

MSP01\151073.1
ID\JDKE - 111160\0001

Dated: January 12, 2015

**DYKEMA GOSSETT PLLC**

s/ Timothy D. Kelly
Timothy D. Kelly (#54926)
Jared D. Kemper (#0390427)
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 486-1904
tkelly@dykema.com
jkemper@dykema.com

*Attorneys for Defendants*

56